# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS,

    Plaintiff,

    v.

KEN SALAZAR, Secretary of the Interior,

    Defendant.

Civil Action No. 08–1596 (CKK)

## MEMORANDUM OPINION
### (September 28, 2010)

Plaintiff, WildEarth Guardians, brings this action against Defendant, Ken Salazar, Secretary of the Interior,[1] pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. § 701 *et. seq.* Plaintiff seeks judicial review of the Fish and Wildlife Service's ("FWS") final agency actions denying Plaintiff's petition to reclassify the Utah prairie dog as an endangered species under the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et. seq.*, as well as Plaintiff's petition to initiate rulemaking to repeal a regulation allowing for the limited extermination of Utah prairie dogs. Currently before the Court are Plaintiff's [33] Motion for Summary Judgment ("Pl.'s Mot."), Defendant's [34] Cross-Motion for Summary Judgment ("Def.'s Cross-Mot."), and Plaintiff's [36] Reply in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Reply"). The Court has thoroughly reviewed the parties' submissions, the administrative record, applicable case law, the relevant statutory and regulatory authority, as well as the record of the case as a whole. For the reasons set forth below, the Court shall GRANT-IN-PART and DENY-

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the current Secretary of the Interior, Ken Salazar, has been automatically substituted as defendant.

IN-PART Plaintiff's [33] Motion for Summary Judgment, shall GRANT-IN-PART and DENY-IN-PART Defendant's [34] Cross-Motion for Summary Judgment, and shall remand this matter to the agency for further consideration consistent with this Memorandum Opinion. Specifically, the Court shall GRANT Plaintiff's Motion for Summary Judgment and DENY Defendant's Cross-Motion for Summary Judgment with respect to Plaintiff's petition to reclassify the Utah prairie dog because (1) FWS failed to explain why the reduction in the species' historical range did not indicate that reclassification may be warranted and (2) FWS failed to consider the cumulative effect of the ESA's listing factors as required under 50 C.F.R. § 424.11(c). In addition, the Court shall DENY Plaintiff's Motion for Summary Judgment and GRANT Defendant's Cross-Motion for Summary Judgment insofar as Plaintiff asserts that FWS' refusal to initiate rulemaking was arbitrary, capricious, and not in accordance with the ESA.

## I. BACKGROUND

### A.    *Statutory and Regulatory Background*

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b). An endangered species is "any species which is in danger of extinction throughout all or a significant portion of its range . . . ." *Id.* § 1532(6). In contrast, a threatened species is one that "is likely to become an endangered species within the foreseeable future . . . ." *Id.* § 1532(20).

To be protected under the ESA, a species must be "listed" as either an endangered or threatened species by the Secretary of the Interior.[2] *See id.* § 1531(b). Although the Secretary

_____

[2] The Secretary has delegated his duties for terrestrial (i.e., non-marine) species to the FWS. *See* 50 C.F.R. § 402.01(b). The Court shall use the term "FWS" and "Secretary" interchangeably throughout this Memorandum Opinion.

may list species himself, *see id.* § 1533(a), individual citizens may also petition the Secretary to list, delist, or reclassify a species, *see id.* § 1533(b)(3)(A).  To the extent possible, within 90-days of receiving such a petition, "the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted."  *Id.*; *see also* 50 C.F.R. § 424.14(b)(1) (providing that, "to the maximum extent possible," the Secretary is to make this finding within 90-days).

A petition contains "substantial information" when it has an "amount of information that would lead a reasonable person to believe that the measure proposed in the petition may be warranted."  *Id.*[3]  When determining whether the petitioned action "may be warranted," the Secretary examines the following five listing factors' individual and cumulative effect on the species:

> (A)   the present or threatened destruction, modification, or curtailment of its habitat or range;
>
> (B)   overutilization for commercial, recreational, scientific, or educational purposes;
>
> (C)   disease or predation;
>
> (D)   the inadequacy of existing regulatory mechanisms; or

---

[3] In particular, when evaluating if the petition has presented "substantial information," the Secretary must consider whether the petition: "(i) Clearly indicates the administrative measure recommended and gives the scientific and any common name of the species involved; (ii) Contains detailed narrative justification for the recommended measure, describing, based on available information, past and present numbers and distribution of the species involved and any threats faced by the species;(iii) Provides information regarding the status of the species over all or a significant portion of its range; and (iv) Is accompanied by appropriate supporting documentation in the form of bibliographic references, reprints of pertinent publications, copies of reports or letters from authorities, and maps."  *Id.* § 424.14(b)(2).

(E)     other natural or manmade factors affecting its continued
        existence.

16 U.S.C. § 1533(a)(1); *see also* 50 C.F.R. § 424.11(c) (providing that species are to be listed

based on "any one or a combination" of the abovementioned factors).  In making this

determination, the Secretary may only consider "the best available scientific and commercial

information regarding a species' status, without reference to possible economic or other impacts

of such determination."  *Id.* § 424.11(b); 16 U.S.C. § 1533(b)(1)(A).  The Secretary's finding in

regards to a petition, referred to as a "90-day finding," is published in the Federal Register.  *See*

*id.* § 1533(b)(3)(A).

    If the Secretary's 90-day finding concludes that the petition presents substantial

information in support of the petitioned action, the Secretary then must "promptly commence a

review of the status of the species concerned."  *Id.*  This review culminates in another finding

issued within 12-months of receipt of the petition that concludes whether the petitioned action is:

(a) warranted; (b) not warranted; or (c) warranted but precluded by other listing activity.  *Id.* §

1533(b)(3)(B).

    The ESA extends certain protections to listed species, including, most pertinent to this

case, a prohibition on the "take" of an endangered species.  *Id.* § 1538(a)(1)(B).  The term "take"

is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to

attempt to engage in any such conduct."  *Id.* § 1532(19).  Although the ESA does not

automatically extend the take prohibition to threatened species, the Secretary has the discretion,

under ESA subsection 4(d), to "issue such regulations as he deems necessary and advisable to

provide for the conservation of [threatened] species."  *Id.* § 1533(d).  The Secretary has exercised

this discretion to generally extend the take prohibition to threatened species.  *See* 50 C.F.R. §

4

17.31.

B.    *Factual Background* [4]

The Utah prairie dog (*Cynomys parvidens*) is one of five prairie dogs species, all of which are native to North America and have non-overlapping geographic ranges. AR 1 at 263 (72 Fed. Reg. 7843, 7843 (Feb. 21, 2007) (FWS' 90-day finding) (hereinafter "Finding")).[5] The Utah prairie dog's range is confined to five southwestern Utah counties, rendering it currently the most geographically restricted of all prairie dog species. *Id.* at 263-64. The Utah prairie dog lives in aggregations called colonies, towns, or villages. *Id.* at 903 (John L. Hoogland, *Black-tailed Prairie Dog in* Wild Mammals of North America: Biology, Management, and Conservation 232, 237 (George A. Feldhamer, Bruce C. Thompson & Joseph A. Chapman eds., 2nd ed. 2003)). Its preferred habitat consists of swale formations with moist herbage and well-drained soil conducive for burrowing. *Id.* at 264 (Finding). Utah prairie dogs are also predominately herbivores, preferring alfalfa and grasses, and are true hibernators that cease most surface activity during the harsher winter months. *Id.*

---

[4] The Court's review in this case is "confined to the full administrative record before the agency at the time the decision was made." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). "The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court." *Id.* Accordingly, although both parties at times refer to information outside the administrative record, the Court does not consider such information in discussing the relevant factual and procedural background of this case or in evaluating the parties' arguments.

[5] There are two administrative records in this case. The Court adopts the parties' convention of citing to the administrative record for FWS' denial of Plaintiff's petition to reclassify the prairie dog as endangered as "Administrative Record 1," or "AR 1," and the administrative record for FWS' denial to initiate rulemaking as "Administrative Record 2," or "AR 2." Supplements to both administrative records were filed. To the extent the supplements are not consecutively paginated with their respective administrative records, the Court adopts the following convention for a citation to the first page of the fourth document in a supplement to the second administrative record filed as docket number 27: AR 2 Supp. Dkt. # 27-4, at 1.

Although the first Utah prairie dog census was not conducted until 1976, historical estimates have placed the species' population in the 1920s at 95,000 animals across a range of 713 square miles.[6] *Id.* Since then, the species has declined due to drought, habitat alteration, disease (predominately sylvatic plague, known as bubonic plague in humans), and targeted eradication by humans. *See id.* at 264, 268; *id.* at 1104 (Rodney L. Player & Philip J. Urness, *Habitat Manipulation for Reestablishment of Utah Prairie Dog in Capitol Reef National Park*, 42 Great Basin Naturalist 517, 517 (1982)).

In 1973, the species declined to approximately 3300 animals across thirty-seven colonies and, consequently, FWS listed the Utah prairie dog as an endangered species under the ESA. Complaint ¶ 26, Docket No. [1]; Answer ¶ 26, Docket No. [9]; *see also* AR 1 at 251 (38 Fed. Reg. 14678 (June 4, 1973)). Six years later, in 1979, the Utah Division of Wildlife and Resources ("UDWR") petitioned FWS to remove the species from the List of Endangered and Threatened Wildlife. AR 1 at 265 (Finding). In 1984, FWS responded to UDWR's petition by reclassifying the species as threatened and concluded that although "the Utah prairie dog is still threatened over much of its range," because the species' population has increased since 1972, it is not longer in danger of extinction. *Id.* at 252 (49 Fed. Reg. 22,330, 22330 (May 29, 1984)).

The 1984 reclassification decision was accompanied by a rule promulgated under ESA subsection 4(d) that abrogated the general prohibition on the take of threatened species in regards

---

[6] The Court notes that the parties disagree on the accuracy of these estimates. For example, FWS argues that because no formal census was conducted until 1976, "[i]t is probably not possible to obtain accurate figures of past populations." Def.'s Cross-Mot. at 7 (quoting AR 1 at 1204 (1991 Utah Prairie Dog Recovery Plan)). Plaintiff, in turn, argues that even if the estimation is imperfect, it is the best information available and FWS itself has previously relied on this estimation. *See* Pl.'s Mot. at 30. The Court recognizes the parties disagreement and its citation to the 1920 estimate should not be construed as an endorsement of either parties' view of the estimate's veracity.

to the Utah prairie dog and permitted a maximum take of 5000 animals per year under a permitting scheme administered by UDWR. *Id.* at 252, 255. In 1991, FWS, citing increased population counts, increased the allowed take for Utah prairie dogs to 6000 animals per year (hereinafter "1991 Rule"). AR 1 at 257, 259 (56 Fed. Reg. 27,438, 27,440 (June 14, 1991)). When the pending motions were filed, the 1991 Rule was still in effect. *See* Pl.'s Reply at 21-22. Under the 1991 Rule, the UDWR issues take permits on a case-by-case basis after considering whether the proposed take "is necessary for the conservation and management of the species and the effect on overall population status." AR 1 at 255 (49 Fed. Reg. at 22,333). Permits are granted only for those Utah prairie dogs causing damage to the land, *id.* at 259 (56 Fed. Reg. at 27,440), and for no more than ten percent of the animals in a given colony, *id.* at 269 (72 Fed. Reg. at 7849). From the inception of the permitted take program in 1985 until 2008, a total of 49,204 takes have been permitted, resulting in 21,054 reported takes, and the average yearly reported take has been approximately 960 animals. *See* AR 2 Supp. Dkt. # 27-4, at 1 (Summary of Utah Prairie Dog Control Program (1985-2008)).

C.    *Procedural Background*

On February 3, 2003, Plaintiff[7] filed a petition with FWS requesting that the Utah prairie dog be reclassified as endangered (hereinafter "Reclassification Petition"). *See* AR 1 at 1-213. In the Reclassification Petition's 189 pages of discussion and analysis, Plaintiff cited to over 200 sources and described why it believes that the ESA's listing factors indicate that reclassifying the Utah prairie dog as endangered may be warranted. *See* Pl.'s Mot. at 18, 32. FWS acknowledged

---

[7] Note, when the Reclassification Petition was filed Plaintiff was called "Forest Guardians." *See* AR 1 at 1 (Reclassification Petition). Plaintiff has since changed its name to "WildEarth Guardians." *See* Pl.'s Mot. at 24 n.3.

receipt of the Reclassification Petition in a letter dated November 21, 2003, in which it advised Plaintiff that funding restrictions prevented FWS from initiating a 90-day finding during the 2003 and 2004 fiscal years. AR 1 at 214 (Letter from John A. Blankenship, Deputy Regional Dir., FWS, Dep't of the Interior, to Dr. Nicole Rosemarino, Endangered Species Dir., Forest Guardians (Nov. 21, 2003)).

On February 2, 2005, while Plaintiff awaited FWS' reply to the Reclassification Petition, Plaintiff petitioned FWS to repeal the 1991 Rule, as well as to promulgate a new rule restricting the translocation of Utah prairie dogs from private to public lands (hereinafter "APA Petition"). AR 2 at 1344-66 (APA Petition). The APA Petition incorporated by reference the Reclassification Petition's claims and argued, *inter alia*, the 1991 Rule hinders the recovery of the Utah prairie dog. *Id.* at 1346, 1351-56. FWS acknowledged receipt of the APA Petition in a letter dated April 6, 2005. AR 2 at 1368 (Letter from Acting Mountain-Prairie Region Dir., FWS, Dep't of the Interior, to Dr. Nicole Rosemarino, Endangered Species Dir., Forest Guardians (Apr. 6, 2005)).

On February 2, 2006, nearly three years after Plaintiff filed the Reclassification Petition, FWS had not initiated a 90-day finding and so Plaintiff filed suit to compel FWS to do so. Compl. ¶ 35; Answer ¶ 35.[8] In accordance with the court-approved settlement agreement in that case, FWS was required to publish a 90-day finding by February 17, 2007. *See* Dkt. # 11, *Forest Guardians v. Kempthorne*, Civ. No. 06-183(RBW).

On February 21, 2007, FWS published its 90-day finding in regards to the Reclassification Petition (hereinafter "Finding"). *See* AR 1 at 263-72 (72 Fed. Reg. at 7849-51).

---

[8] *See Forest Guardians v. Kempthorne*, Civ. No. 06-183(RBW).

The Finding concluded that "substantial scientific or commercial information has not been presented by [Plaintiff] indicating that reclassification of the Utah prairie dog . . . from threatened to endangered may be warranted." *Id.* at 271 (noting also that the Reclassification Petition "did not identify or present substantial new information indicating that the level of threats to the species has changed significantly since its reclassification to threatened in 1984."). The Finding was influenced by the most recent population Utah prairie dog census, which indicated that the species' population was twice as high as when the species was reclassified as threatened in 1984. *Compare id.* (noting spring 2005 count was 5,381), *with* AR 1 Supp. Dkt. #27-3, at 3 (Spring Counts of Adult Utah Prairie Dogs) (listing the spring 1984 count at 2,522).[9]    On September 16, 2008, Plaintiff filed its complaint in this case. Count I alleges that FWS violated the ESA and APA when it denied the Reclassification Petition. Compl. ¶ 39 Count II alleges that FWS violated the APA by failing to rule on the APA Petition. Compl. ¶ 41. Over five months later, on February 23, 2009, FWS issued its response to Plaintiff's APA Petition (hereinafter "Response"). AR 2 Supp. Dkt. #27-2. In the Response, FWS denied Plaintiff's request to promulgate a new rule because Plaintiff did not include the text of the proposed rule as required under 43 C.F.R. § 14.2. *Id.* at 2. As for Plaintiff's request to repeal the 1991 Rule, FWS found that the most recent Utah prairie dog census data "does not appear to support [Plaintiff's]

_____

[9] The parties disagree on the methodology employed in the 1984 census and, consequently, the extent to which the 1984 census reflected the actual Utah prairie dog population at that time. *Compare* Pl.'s Mot. at 15 (arguing that the methodology employed in 1984 counted 80% of the population), *with* Def.'s Cross-Mot. at 10 n.3 (arguing that UDWR employed a method in 1984 that only counted 50% of the population). Regardless, the parties do not appear to disagree that the 2005 census, which FWS relied upon in the Finding, counted approximately 50% of the actual population. *See* Pl.'s Mot. at 31, 31 n.53-54; Def.'s Cross-Mot. at 21, 21 n.7. This indicated a spring 2005 population of about 10,762 animals. *See* Pl.'s Mot. at 31. Additionally, because the census occurs in the spring, it only includes those animals that have survived the winter and no juveniles. *See* AR 1 at 259 (56 Fed. Reg. at 27,440).

assertion that the species is in danger of extinction"[10] and invited Plaintiff to comment on a forthcoming amended version of the 1991 Rule.[11]  *Id.* at 1 (Response).  The Response constituted FWS' "final decision" on Plaintiff's APA Petition.  *Id.* at 3.

In light of the Response, the parties filed [15] Stipulation to Permit the Filing of a Supplemental Complaint and Joint Motion to Reset Deadlines.  The Court granted Plaintiff's request, pursuant to Federal Rule of Civil Procedure 15(d), to file a supplemental complaint.  *See* [17] Am. Scheduling and Procedures Order (Apr. 14, 2009).  On April 23, 2009, Plaintiff filed its [18] First Supplement Complaint in which it amended Count II to allege that FWS' denial of the APA Petition violated the APA.  Suppl. Compl. ¶ 43.  FWS then filed the administrative record for the Reclassification Petition on March 27, 2009, [13] Notice of Lodging Admin. Record, and the administrative record for the APA Petition on June 11, 2009, [20] Notice of Lodging Admin. Record.  Plaintiff moved to supplement the Reclassification Petition's administrative record, [23] Mot. to Suppl. the Admin. Record, which FWS opposed, [24] Opp'n to Pl.'s Mot. to Suppl. the Admin. Record.  The Court ultimately denied the motion.  *See Wildearth Guardians v. Salazar*, 670 F. Supp. 2d 1 (D.D.C. 2009).

Subsequently, the Court adopted the parties' proposed summary judgment briefing schedule, Min. Order (Dec. 11, 2009), pursuant to which Plaintiff filed its [33] Motion for Summary Judgment on January 29, 2010, Defendant filed its [34] Cross-Motion for Summary

_____

[10] The most recent census data was from the spring of 2007 and indicated a total population of nearly 12,000 animals.  *See* AR 2 Supp. Dkt. #27-2, at 1 (Response).

[11] Both parties acknowledge that this amended version of the 1991 Rule remains forthcoming.  *See* Pl.'s Mot. at 26 n.49; Def.'s Cross-Mot. at 34 n.8.

Judgment on March 5, 2010,[12] and Plaintiff filed its [36] Reply in Support of Plaintiff's Motion for Summary Judgment on March 19, 2010.  The briefing on the parties' motions for summary judgment is now complete and the matter is ripe for the Court's review and resolution.

## II. LEGAL STANDARD

"Courts must defer to an agency's interpretation of a statute that it implements 'so long as it is reasonable, consistent with the statutory purpose, and not in conflict with the statute's plain language.'"  *Davis v. Latscher*, 202 F.3d 359, 364 (D.C. Cir. 2000) (quoting *OSG Bulk Ships v. United States*, 132 F.3d 808, 814 (D.C. Cir. 1998)); *see Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 845 (1984).  "Similarly, provided it does not violate the Constitution or a federal statute, an agency's interpretation of its own regulations 'will prevail unless it is plainly erroneous or inconsistent with the plain terms of the disputed regulations.'" *Id.* (quoting *Everett v. United States*, 158 F.3d 1364, 1367 (D.C. Cir. 1998) (internal quotation marks omitted).

The APA governs judicial review of agency action under the ESA.  *Cabinet Mountains Wilderness v. Peterson*, 685 F.2d 678, 685 (D.C. Cir. 1982) ("Since the ESA does not specify a standard of review, judicial review is governed by section 706 of the [APA].").  Judicial review of agency decisions "is normally confined to the full administrative record before the agency at the time the decision was made."  *Envt'l Def. Fund.*, 657 F.2d at 284; *see also Richards v. Immigration & Naturalization Serv.*, 554 F.2d 1173, 1177 (D.C. Cir. 1977) ("Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record.").  Under the APA, a court must

---

[12] This filing also includes Defendant' opposition to Plaintiff's motion for summary judgment.

set aside agency decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "'The party challenging an agency's action as arbitrary and capricious bears the burden of proof.'" *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak Petroleum, Inc. v. Fed. Energy Regulatory Comm'n*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)).

A court's "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted). A reviewing court "will uphold [an agency's] findings, though of less than ideal clarity, if the agency's path may be reasonably discerned . . . ." *Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989) (internal quotation marks and citations omitted). However,

> an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that would not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."

*State Farm*, 463 U.S. at 43 (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see also McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187

(D.C. Cir. 2004) (holding that the "Court will not defer to the agency's conclusory or unsupported allegations").

Furthermore, reviewing courts are to "give an extreme degree of deference to the agency when it 'is evaluating scientific data within its expertise.'" *Huls Am. Inc. v. Browner*, 83 F.3d 445, 452 (D.C. Cir. 1996) (quoting *Int'l Fabricare Inst. v. E.P.A.*, 972 F.2d 384, 389 (D.C. Cir. 1992)). This includes "an agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . ." *BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 781 (D.C. Cir. 2008) (internal quotation marks omitted); *see also Colo. River Cutthroat Trout v. Kempthorne*, 448 F. Supp. 2d 170, 174 (D.D.C. 2006) ("There is a strong presumption in favor of upholding decision of the FWS in view of its expertise in the area of wildlife conservation and management and the deferential standard of review.").

## III. DISCUSSION

### A.     *The 90-Day Finding*

As a threshold matter, the Court notes the limited nature of it review in this case. In reviewing the Finding, the Court is not asked to determine whether the Utah prairie dog should ultimately be reclassified as endangered, or even whether the Court thinks reclassification may be warranted. *See Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983) (explaining that under the arbitrary and capricious standard of review a court "need not find that [the agency's decision] is the only reasonable one, or even that it is the result [the Court] would have reached had the question arise in the first instance in judicial proceedings."). Rather, the issue before this Court is whether, when issuing the Finding, FWS properly applied the ESA and "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including

a rational connection between the facts found and the choice made." *PPL Wallingford Energy*, 419 F.3d at 1198 (D.C. Cir. 2005) (quoting *State Farm*, 463 U.S. at 43) (internal quotation marks omitted).

In light of the aforementioned legal standard, the Court now turns to the merits of Plaintiff's arguments. Plaintiff has alleged that the Finding was arbitrary, capricious and/or contrary to law for several reasons. For two reasons, the Court agrees that the Finding must be vacated and remanded to FWS for further consideration.

1. FWS Failed to Explain Why the Reduction in the Utah Prairie Dog's
Historical Range Did Not Constitute a "Significant Portion of Its Range"

Plaintiff argues that the Finding is arbitrary, capricious, and not in accordance with the ESA because FWS did not analyze how the reduction in the Utah prairie dog's historical range does not indicate that reclassifying the species as endangered may be warranted. *See* Pl.'s Mot. at 28-32. Plaintiff argues that the Utah prairie dog's current range has been reduced by nearly eighty-seven percent from its historical estimations, thereby indicating the species is "in danger of extinction throughout . . . a significant portion of its range" such that reclassification to endangered may be warranted. *See id.* at 29 (quoting 16 U.S.C. § 1532(6) (defining "endangered species" )).

In support of this argument, Plaintiff principally relies on the Ninth Circuit's holding in *Defenders of Wildlife v. Norton* that "where . . . it is on the record apparent that the area in which the [species] is expected to survive is much smaller than its historical range, the Secretary must at least explain her conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" 258 F.3d 1136, 1145 (9th Cir. 2001) (hereinafter *Defenders (Lizard)*); *see also* Pl.'s Reply at 6-8. In reaching this conclusion, the Ninth Circuit rejected the

parties' definitions of the phrase "significant portion of its range" and, after consulting the ESA's legislative history and the Secretary's historical practice, concluded that "a species can be extinct 'throughout . . . a significant portion of its range' if there are major geographical areas in which it is no longer viable but once was." *Id.*; *see also id.* at 1138, 1145-46 (vacating and remanding the Secretary's decision because the Secretary failed to expressly explain how a thirty-four percent reduction in a species' historical range was not a significant portion of the species' range).

Courts in this Circuit have found the Ninth Circuit's reasoning in *Defenders of Wildlife v. Norton* persuasive. *See, e.g.*, *Defenders of Wildlife v. Kempthorne*, Civ. No. 04-1230(GK), 2006 WL 2844232, at *5 (D.D.C. Sept. 29, 2006) (hereinafter *Defenders (Lynx II)*) (finding the Ninth Circuit's reasoning "persuasive" and applying its definition of "significant portion of its range"); *Sw. Ctr. for Biological Diversity v. Norton*, Civ. No. 98-934 (RMU/JMF), 2002 WL 1733618, at *14 (D.D.C. July 29, 2002) (applying the Ninth Circuit's definition of "significant portion of its range"). Moreover, Judge Gladys Kessler has twice relied on the Ninth Circuit's holding to vacate and remand as arbitrary, capricious, and contrary to the ESA's purpose, FWS decisions that have failed to explain how a loss of three of a species' four population regions did not constitute a significant portion of the species' range. *See Defenders of Wildlife v. Norton*, 239 F. Supp. 2d 9, 21 (D.D.C. 2002) (hereinafter *Defenders (Lynx I)*), *vacated in part on other grounds*, 89 F. App'x 273 (D.C. Cir. 2004) (vacating as moot the district court's enjoinment of FWS from concurring in ESA § 7 determinations and remanding the case for further consideration); *Defenders Lynx II*, 2006 WL 2844232, at *5-6, 11, 13 (vacating and again remanding the decision to FWS because the agency failed to address how three of four population regions do not constitute a significant portion of the species' range). This Court joins the other courts in this

Circuit who have found the Ninth Circuit's holding persuasive and shall apply the Ninth Circuit's standard that "where . . . it is on the record apparent that the area in which the [species] is expected to survive is much smaller than its historical range, the Secretary must at least explain [his] conclusion that the area in which the species can no longer live is not a 'significant portion of its range.'" *Defenders (Lizard)*, 258 F.3d at 1145.

In this case, FWS does not argue that it conducted a significant portion of the range analysis. *See* Def.'s Cross-Mot. at 16-19. Rather, FWS argues that the phrase is ambiguous, FWS' reasonable interpretation is entitled to deference, and, in any event, Plaintiff is barred from raising the significant portion of the range issue because the Reclassification Petition failed to do so. *See id.* The Court rejects these arguments and vacates and remands the Finding to FWS to explain in the first instance how the Utah prairie dog's reduction of its historical range does not indicate that reclassifying the species as endangered may be warranted.

First, Plaintiff is not barred from raising the significant portion of the range issue. As Plaintiff points out, the phrase "significant portion of its range" is part of the ESA's definition of "endangered species." Pl.'s Reply at 10-11 (quoting 16 U.S.C. § 1532(6) (defining "endangered species")). Thus, the Reclassification Petition's request to reclassify the Utah prairie dog as endangered sufficiently raised the significant portion of the range issue. *See Tex Tin Corp. v. E.P.A.*, 935 F.2d 1321, 1323 (D.C. Cir. 1991) (per curiam) ("An objection must be made with sufficient specificity reasonably to alert the agency."). Additionally, the concern of fairness underlining the exhaustion doctrine is absent in this case. *See Found. on Educ. Trends v. Heckler*, 756 F.2d 143, 156 (D.C. Cir. 1985) ("[W]e note that the exhaustion doctrine is premised on a view of fairness to the agency and to the litigants."). FWS' obligation to explain how the

reduction from the Utah prairie dog's historical range does not constitute a significant portion of the species' range derives from the ESA's definition of "endangered species." Therefore, FWS should not be surprised that it needed to conduct such an analysis in this case. Accordingly, the Court finds that the exhaustion doctrine does not bar Plaintiff from raising the significant portion of the range issue in this appeal.

Second, although the phrase "significant portion of its range" is ambiguous, *see Defenders (Lizard)*, 258 F.3d at 1145, the interpretation FWS now urges this Court to adopt is not entitled to deference as it is conspicuously absent from FWS' consideration of the Reclassification Petition. Most importantly, the Finding itself does not indicate that FWS defined, let alone applied, "significant portion of its range" in the manner FWS now advances in this case. Equally telling, FWS' briefing does not cite to this case's administrative record to establish how FWS interpreted the phrase when it was considering the Reclassification Petition. *See* Def.'s Cross-Mot. at 18 (quoting *Greater Yellowstone Coalition, Inc. v. Servheen*, 672 F. Supp. 2d 1105, 1124 (D. Mont. 2009)). The Court owes no deference to FWS' interpretation of a statutory phrase that first appears on appeal. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (granting no deference to "agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question . . . .").

Third, even if the Court were to defer to FWS' interpretation of "significant portion of its range,"[13] the Court would nonetheless have to vacate and remand the Finding because there is no indication that FWS in fact applied this definition in this case, *see Hall*, 864 F.2d at 873 (holding that an agency's decision must "be sufficient to permit the court to discern the path [the agency] has taken").[14] In fact, FWS implicitly concedes as much when it failed to argue that it conducted such an analysis and instead argues that Plaintiff waived this issue. *See* Def.'s Cross-Mot. at 18-19.

The Utah prairie dog's range has declined at least fifty percent from 1925 to 1975. AR 1 at 264 (Finding). The Finding also indicates that in 1971 the Utah prairie dog was present in an area comprising 61,440 acres, while the species' estimated range in 1920 was an area comprising 456,320 acres. *See id.* at 264-65. The difference between the 1971 range and the 1920 estimated range amounts to a nearly eighty-seven percent reduction in the Utah prairie dog's historical range. *See* Pl.'s Mot. at 10. The Finding does not explain, however, how this reduction, or even

---

[13] FWS argues that it interpreted "range" to mean "current range, not historical range" and "significant" to mean "based on a variety of factors that indicate the importance of the range to the species survival and the preservation of the species' ecosystem" and "is not based on any present or quantitative measurement of range." Def.'s Cross-Mot. at 18 (quoting *Greater Yellowstone Coalition*, 672 F. Supp. 2d at 1124).

[14] Similarly, although the parties have advanced a total of three different definitions of "significant portion of its range," the Court does not address which should be applied in this case because FWS failed to apply any of them in the Finding. *See Palisades Gen Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) ("[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards.") (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999)).

the fifty percent reduction, is not "a significant portion of [of the species'] range."[15]  It may very

well be that these reductions do not amount to a significant portion of the species range.[16]

However, FWS' failure to explain why this might be so renders the Finding arbitrary, capricious,

and not in accordance with the ESA.  *See State Farm*, 463 U.S. at 43 (holding that an agency

decision is arbitrary and capricious when it "entirely failed to consider an important aspect of the

problem").  Accordingly, this Court vacates and remands the Finding to FWS to explain in the

first instance how the reduction in the Utah prairie dog's historical range does not constitute a

significant portion of the species' range.[17]

### 2.    FWS Failed to Consider the Listing Factors' Cumulative Effect

Plaintiff also argues that FWS acted arbitrarily and capriciously when it failed to consider

the listing factor's cumulative effect on the species.  *See* Pl.'s Mot. at 39; *see also* 50 C.F.R. §

---

[15] The Finding, however, does question the reliability of the historical estimate and indicates that a forthcoming study may produce more reliable results.  AR 1 at 264 (Finding) ("We believe the best information concerning actual Utah prairie dog habitat is from ongoing mapping efforts . . . however, current occupancy has not been verified for this mapped habitat area, or for other areas of historical habitat.").  Forthcoming studies, however, cannot contradict the only available evidence regarding the Utah Prairie dog's range.  *See* 50 C.F.R. § 424.11(b) (allowing FWS to rely on "the best *available* scientific and commercial information regarding a species' status") (emphasis added).

[16] *See Defenders (Lizard)*, 258 F.2d at 1143 ("[I]t simply does not make sense to assume that the loss of a predetermined percentage of habitat or range would necessarily qualify a species for listing.  A species with an exceptionally large historical range may continue to enjoy healthy population levels despite the loss of a substantial amount of suitable habitat.").

[17] In so holding, the Court makes no finding as to the reasonableness of the interpretation of "significant portion of its range" FWS advance in this appeal or this interpretation's application in this case.  Although such arguments may ultimately be successful, the agency—and not this Court—must make that determination in the first instance.  *See State Farm*, 463 U.S. at 43 (a review court may not supply "a reasoned basis for the agency's action the agency itself has not given") (internal quotation marks and citations omitted).

424.11(c) (requiring listing decisions to be based on "any one *or a combination* of the [listing] factors") (emphasis added); *Carlton v. Babbitt*, 900 F. Supp. 526, 530 (D.D.C. 1995) ("FWS must consider each of the listing factors singularly *and in combination* with the other factors") (emphasis added).  FWS argues that it did consider the listing factors' cumulative effect and cites to three documents in the administrative record in support of this assertion.  Def.'s Cross-Mot. at 29-30.  These citations, however, do not support FWS' claim.

First, two of the documents are a draft and revised version of a table prepared by the Utah Ecological Services Field Office in a briefing to the FWS' Mountain-Prairie Range Regional Director regarding the Reclassification Petition.  *See* Def.'s Cross-Mot. at 30 (citing AR 1 at 1665 (Nov. 9, 2006 Briefing); AR 1 at 1780 (Dec. 14, 2006 Briefing)).  In both the versions, FWS' analysis of the listing factors' cumulative effect is limited to the following: "Although we agree that these factors are hindering recovery of the species, we disagree that the level of threat is significant enough to warrant endangered status."  AR 1 at 1665 (Nov. 9, 2006 Briefing); AR 1 at 1780 (Dec. 14, 2006 Briefing).  This statement, however, is merely conclusory and does not explain why FWS believes that the listing factors' cumulative effect does not indicate that reclassifying the Utah prairie dog as endangered may be warranted.  *PPL Wallingford Energy*, 419 F.3d at 1198 (quoting *State Farm*, 463 U.S. at 43) ("[A]n agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made'") (internal quotation marks omitted); *see also McDonnell Douglas Corp.*, 375 F.3d at 1187 (holding that the "Court will not defer to the agency's conclusory or unsupported allegations").  Accordingly, the table entries do not allow FWS to survive the arbitrary and capricious standard of review.

Lastly, FWS cites to the Finding itself and argues that within it FWS "determined that [the factors] collectively did not constitute substantial scientific information." Def.'s Cross-Mot. at 29-30. Notably, however, FWS does not quote an excerpt of the Finding that purportedly supports this assertion. *See id.* Nor does the Finding itself explicitly indicate that FWS analyzed the listing factors' cumulative effect. *See* AR 1 at 271(Finding); *see also Hall*, 864 F.2d at 873 (holding that an agency's decision must "be sufficient to permit the court to discern the path [the agency] has taken").

The Finding page cited by FWS does, however, contain a conclusion of the agency's analysis of the listing factors' individual impacts on the Utah prairie dog. *See* AR 1 at 271 (Finding). But such a conclusion does not constitute an analysis of the listing factors' cumulative effect because it does not explain how the individual factors combine to affect the Utah prairie dog. *See PPL Wallingford Energy*, 419 F.3d at 1198 (quoting *State Farm*, 463 U.S. at 43) ("[A]n agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made'") (internal quotation marks omitted). In essence, by failing to analyze the listing factors' cumulative impact, FWS has required Plaintiff to prove by one factor alone that reclassifying the Utah prairie dog may be warranted. This transformation ignores a clear mandate from the ESA's regulations, as well as the Finding's articulation of FWS' responsibility in a 90-day finding. *See* 50 C.F.R. § 424.11(c) (requiring listing decisions to be based on "any one or a combination of the [listing] factors"); AR 1 at 265 (Finding) ("Listing actions may be warranted based on any of the above threat factors, either singly or in combination."). Accordingly, the Court finds that FWS' failure to consider the cumulative effect of the listing factors renders the Finding arbitrary and

capricious.  *See State Farm*, 463 U.S. at 43 ("an agency [decision] would be arbitrary and

capricious if the agency . . . entirely failed to consider an important aspect of the problem").

FWS attempts to avoid this conclusion by seeking refuge under the APA's deferential

standard of review and arguing that this Court must "uphold a decision of less than ideal clarity if

the agency's path may reasonably be discerned."  Def.'s Cross-Mot. at 30 (quoting *Frizelle v.*

*Slater*, 111 F.3d 172, 176-77 (D.C. Cir. 1997)).[18]  However, as discussed above, neither the

Finding nor the table entries provide a non-conclusory, discernable basis for believing that FWS

in fact considered the listing factors' cumulative effect.  Even under the deferential arbitrary and

capricious standard of review, a reviewing court "may not supply a reasoned basis for the

agency's action that the agency itself has not given."  *State Farm*, 463 U.S. at 43 (quoting

*Chenery Corp.*, 332 U.S. at 196).  Accordingly, as FWS has failed to cite to a document in the

Finding's over 2000 page administrative record that evidences, in a non-conclusory fashion, that

FWS considered the listing factor's cumulative effect, the Court concludes that the Finding must

be vacated and this case remanded to the agency.  On remand, FWS must explain whether the

listing factor's cumulative effect indicates that reclassifying the species as endangered may be

warranted.[19]

---

[18] FWS also argues that Plaintiff did not identify where the Reclassification Petition
addresses the listing factors' cumulative effect.  Def.'s Cross-Mot. at 30.  This argument is
quickly dismissed for, as Plaintiff identifies in its reply, not only did the Reclassification Petition
identify how the listing factors combine to threaten the Utah prairie dog, Plaintiff's motion for
summary judgment cites to these references as well.  *See* Pl.'s Reply at 20 & 20 n.33; *see also*
Pl.'s Mot. at 19 (citing AR 1 at 95-97 (Reclassification Petition)); *id.* at 21 (citing AR 1 at 167-
71, 191 (Reclassification Petition)); *id.* at 22 (citing AR 1 at 193 (Reclassification Petition)).

[19] The Court does not agree, however, with Plaintiff's argument that FWS similarly erred
by failing to consider the threat of predation.  Pl.'s Mot. at 39.  "It is a hard and fast rule of
administrative law, rooted in simple fairness, that issues not raised before an agency are waived
and will not be considered by a court on review."  *Nuclear Energy Inst., Inc. v. E.P.A.*, 373 F.3d

For the abovementioned reasons, the Court concludes that the Finding must be vacated and remanded to the agency for further consideration consistent with this opinion. In light of this case's current procedural posture, the Court declines to address Plaintiff's remaining arguments regarding the Finding.

### B.      FWS' Response to the APA Petition

In Count II, Plaintiff argues that the Response is inadequate on its face, arbitrary, capricious, and contrary to the ESA. Pl. Mot. at 39-40.[20] In denying a petition for rulemaking, an agency shall provide "prompt notice" of the denial and "[e]xcept in affirming a prior denial or when denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e). Just as with other agency decisions, reviewing courts must overturn a refusal to initiate rulemaking if it is "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *EMR Network v. Fed. Commc'ns Comm'n*, 391 F.3d 269, 272-73 (D.C. Cir. 2004) (quoting 5 U.S.C. § 706(2)).

However, "an 'agency's refusal to institute rulemaking proceedings is at the high end of the range' or level of deference [reviewing courts] give to agency action under [their] 'arbitrary

_____

1251, 1297 (D.C. Cir. 2004). The Reclassification Petition does not address predation in its section entitled: "Identified Threats to the Petitioned Species: Criteria for Listing." AR 1 at 59-187. Notably, although the third ESA listing factor includes disease and predation, 16 U.S.C. § 1533(a)(1)(C), the Reclassification Petition only discussed disease, *see* AR 1 at 60, 104-06. Moreover, Plaintiff cannot rely on the Reclassification Petition's limited background discussion of predation, *see* Pl.'s Reply at 20 n.32, in a 189-page document to claim that it sufficiently raised the predation threat, *see Nat'l Ass'n of Mfrs. v. U.S. Dep't. of Interior*, 134 F.3d 1095, 1111 (D.C. Cir. 1998) ("[W]e decline to find that scattered references to [an issue] in a voluminous record addressing myriad complex technical and policy matters suffices to provide an agency . . . with a 'fair opportunity' to pass on the issue.").

[20] Plaintiff only appeals FWS' refusal to repeal the 1991 Rule and not the FWS' refusal to promulgate a new rule restricting the translocating of Utah prairie dogs. *See* Pl.'s Mot. at 40.

and capricious' review." *Defenders of Wildlife v. Guiterrez*, 532 F.3d 913, 919 (D.C. Cir. 2008)

(quoting *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1, 4-5 (D.C. Cir. 1987)); *see also*

*Massachusetts v. E.P.A.*, 549 U.S. 497, 527 (2007) ("Refusals to promulgate rules are []

susceptible to judicial review, though such review is extremely limited and highly deferential")

(internal quotation marks and citation omitted). "Such a refusal is to be overturned only in the

rarest and most compelling of circumstances . . . which have primarily involved plain errors of

law, suggesting that the agency has been blind to the source of its delegated power." *Am. Horse*

*Prot. Ass'n*, 812 F.2d at 5 (internal quotations and citations omitted); *see also Cellnet Commc'ns,*

*Inc. v. F.C.C.*, 965 F.2d 1106, 1111 (D.C. Cir. 1992) (explaining that "an agency's refusal to

initiate rulemaking is evaluated with a deference so broad as to make the process akin to non-

reviewability.").

The Court finds that Plaintiff has not demonstrated that this case is one of "the rarest and

most compelling of circumstances." *Am. Horse Prot. Ass'n*, 812 F.2d at 5. Accordingly, the

Court shall grant FWS' summary judgment motion in regards to Count II.

### 1. The Response Is Not Procedurally Inadequate

First, Plaintiff claims that the Response is procedurally inadequate and not in accordance

with the law because the Response does not expressly state that FWS denied Plaintiff's request to

repeal the 1991 Rule. *See* Pl.'s Mot. at 40-41. Plaintiff is correct that the Response did not use

the word "denial," or any variation thereof, when discussing Plaintiff's request to repeal the 1991

Rule. Nevertheless, while it is clear that FWS must provide a "brief statement of the grounds

for denial," 5 U.S.C. § 555(e), Plaintiff fails to identify any legal support for its claim that FWS

must expressly indicate it was denying Plaintiff's request. Moreover, it is difficult to see why

such a requirement would even be necessary in this case. The Response indicated that FWS was not repealing the 1991 Rule and that it was FWS' "final decision" on the APA Petition, AR 2 Supp., Dkt. # 27-2 at 3, and by every indication Plaintiff understood the response to be a denial, *see, e.g.*, Suppl. Compl. ¶ 3 ("Through this First Supplemental Complaint [Plaintiff] now challenges [FWS'] February 23, 2009 *denial* of its APA petition . . . .") (emphasis added). Moreover, Plaintiff does not claim that FWS did not provide a brief statement of the grounds for denial as required under 5 U.S.C. § 555(e). Accordingly, the Court rejects Plaintiff's claim that the Response was procedurally inadequate.

**2.**        The Response Is Not Arbitrary or Capricious

Second, Plaintiff argues that FWS' refusal to initiate rulemaking is arbitrary and capricious because the 1991 Rule is biologically infeasible, it deters the species' recovery, and, therefore, it ignores the ESA's mandate. *See* Pl.'s Mot. at 42-44. In particular, Plaintiff seeks to compare this case to *American Horse Protection Association*, in which the D.C. Circuit vacated and remanded the Secretary of the Agriculture's refusal to initiate rulemaking under the Horse Protection Act ("HPA"). 812 F.2d at 2-3, 5-8. The Court rejects Plaintiff's arguments and holds instead that the Response was not arbitrary or capricious.

In *American Horse Protection Association*, the court held that the agency failed to articulate a reasonable explanation for its refusal in part because the agency's two conclusory statements justifying the refusal failed to demonstrate that the refusal was the product of "reasoned decisionmaking." *Id.* at 6 (noting those conclusory statements included the agency's deputy administrator's declaration that: "I have reviewed studies and other materials . . . . On the basis of this information, I believe that the most effective method of enforcing the [HPA] is to

continue the current regulations").  The court also concluded that the agency's refusal to initiate

rulemaking to prohibit a practice that Congress unambiguously intended the HPA to eliminate

indicated that the agency "has been blind to the nature of his mandate from Congress."  *Id.* at 7.

In this case, in contrast, FWS articulated a reasonable explanation for its refusal.[21]  In the

Response, because Plaintiff's APA Petition incorporated by reference its claims in the

Reclassification Petition, FWS also incorporated by reference its conclusions in the Finding to

support its denial.  AR 2 Supp., Dkt. # 27-2 at 1 (Response).  Additionally, FWS provided in the

Response itself that

> Counts in 2007, the most recent data available, documented 5,991
> adult animals indicating a total population of about 12,000 adult Utah
> prairie dogs . . . . This is the second highest population count recorded
> since survey efforts began in 1975.  The available data does not
> appear to support your assertion that the species is in danger of
> extinction.

*Id.*  Far from the two conclusory statements in *American Horse Protection Association*, the

passage cited above indicates that FWS applied the most recent Utah prairie dog census when it

denied the APA Petition.  Accordingly, the Court finds that this decision was in fact "reasoned,"

thereby satisfying the Court's highly deferential review of FWS' refusal to initiate rulemaking.

*See Am. Horse Prot. Ass'n, Inc.*, 812 F.2d at 5 ("[W]e must consider whether the agency's

decisionmaking was reasoned") (internal quotation marks and citation omitted); *see also Cellnet*

---

[21] Contrary to Plaintiff's intimations, the fact that FWS did not respond to every question raised in the twenty-three page APA Petition does not render the Response arbitrary and capricious, so long as the administrative record demonstrates that the Response was the product of reasoned decisionmaking. *See Am. Horse Prot. Ass'n*, 812 F.2d at 6; *see also* 5 U.S.C. § 555(e) (requiring that the notice of denial "be accompanied by a *brief* statement of the grounds for denial") (emphasis added).

*Commc'ns*, 965 F.2d at 1111 ("[A]n agency's refusal to initiate rulemaking is evaluated with a deference so broad as to make the process akin to non-reviewability.").

Additionally, the 1991 Rule's existence does not demonstrate that FWS is ignoring the ESA's mandate because, most importantly, the ESA itself only prohibits the take of endangered—not threatened—species. *See* 16 U.S.C. § 1538(a). Moreover, Congress delegated to the Secretary the authority to determine the extent to which the ESA protects threatened species. *See id.* § 1533(d) ("Whenever any species is listed as a threatened species . . . , the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."). In *American Horse Protection Association*, in contrast, the agency refused to initiate rulemaking to prohibit a practice that Congress explicitly and unambiguously intended the HSA to prohibit. *See* 812 F.2d at 6. Thus, because the ESA does not explicitly prohibit the take of threatened species, the Court finds that the 1991 Rule is not so contrary to Congress's mandate under the ESA such that FWS could be said to be "blind to the source of its delegated power." *Id.* at 7; *see also Gutierrez*, 532 F.3d at 921(requiring challengers to an agency's refusal to initiate rulemaking "to present new evidence strongly suggesting that the agency was unaware of its congressional mandate . . . .") (internal quotation marks and citations omitted).

Finally, although both parties acknowledge that the 1991 Rule's level of take may not be biologically sound, Pl.'s Mot. at 43; Def.'s Cross-Mot. at 32, the administrative record reveals that FWS has relied upon evidence indicating that some permitted take is advantageous to the Utah prairie dogs' recovery, *see* Def.'s Cross-Mot. at 32-33. For example, FWS cites to how controlled take can stimulate population growth, reduce high density populations prone to

decimation by plague, and, consequently, curb the species' boom-and-bust population cycle. *Id.* at 33 (citing AR 2 at 1371; *id.* at 905-06, 908; *id.* at 305; *id.* at 241). The precise level of take that should be permitted is a matter squarely within FWS' technical and scientific expertise and the Court "decline[s] to enter this hyper-technical fray." *BNSF Ry. Co.*, 526 F.3d at 781 ("It is well established that an agency's predictive judgments about areas that are within the agency's field of discretion and expertise are entitled to particularly deferential review, so long as they are reasonable.").

In conclusion, FWS has presented a rational basis for refusing to repeal the 1991 Rule that is adequately supported by the record and, consequently, the Court does not overturn this decision on appeal. Accordingly, the Court shall grant FWS' motion for summary judgment in regards to Count II.

## IV. CONCLUSION

For the reasons set forth above, the Court shall GRANT-IN-PART Plaintiff's [33] Motion for Summary Judgment as to Count I and DENY-IN-PART Plaintiff's Motion for Summary Judgment as to Count II. The Court shall GRANT-IN-PART the Secretary's [34] Cross-Motion for Summary Judgment as to Count II and DENY-IN-PART the Secretary's Cross-Motion for Summary Judgment as to Count I. Accordingly, FWS' decision denying Plaintiff's Reclassification Petition is vacated and remanded to the agency for further consideration consistent with this Memorandum Opinion. An appropriate Order accompanies this Memorandum Opinion.

Date: September 28, 2010

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge
